# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| SCHNEIDER NATIONAL CARRIERS, INC., | ) | |
| | ) | |
| Plaintiff/Counterclaim Defendant, | ) | |
| | ) | |
| v. | ) | C.A. No. 2017-0711-PAF |
| | ) | |
| RAYMOND J. KUNTZ, as Sellers' Representative for RAYMOND J. KUNTZ AND STEVE B. WILLIAMSON, | ) ) ) ) | |
| | ) | |
| Defendant/Counterclaim Plaintiff. | ) | |

## MEMORANDUM OPINION

Date Submitted: April 7, 2020
Date Decided: July 16, 2020

Michael A. Pittenger and Caneel Radinson-Blasucci, POTTER, ANDERSON & CORROON LLP; Wilmington, Delaware; Locke Beatty, Brian Riopelle, Heryka R. Knoespel, MCGUIREWOODS LLP, Raleigh, North Carolina; *Attorneys for Plaintiff/Counterclaim Defendant Schneider National Carriers, Inc.*

John M. Seaman and Matthew L. Miller, ABRAMS & BAYLISS LLP, Wilmington, Delaware; Anthony S. Fiotto and Kate E. MacLeman, GOODWIN PROCTOR LLP; Boston, Massachusetts; *Attorneys for Defendant/Counterclaim Plaintiff Raymond J. Kuntz, as Sellers' Representative for Raymond J. Kuntz and Steve B. Williamson.*

**FIORAVANTI, Vice Chancellor**

This case is a contract dispute over whether the purchaser of a group of trucking companies breached the post-closing operating covenants contained in a stock purchase agreement. The main focus of disagreement centers on a covenant requiring the purchaser to "cause one or more of the Acquired Companies to acquire, in the aggregate, not less than sixty (60) class 8 tractors" every year for three years after the acquisition. The purchaser contends it was required to acquire at least 60 tractors per year across all of the acquired companies, which the purchaser undisputedly did. The sellers contend the purchaser was required to expand the acquired companies' fleet of tractors by at least 60 tractors per year, which the purchaser undisputedly did not do. In other words, was the 60 tractor purchase requirement net or gross?

This Court previously denied the parties' cross-motions for judgment on the pleadings and determined that the covenants at issue are ambiguous. The parties have now filed cross-motions for summary judgment. Each side argues that the extrinsic evidence demonstrates that summary judgment should be granted in its favor. The sellers cite numerous documents and communications during the negotiation process which reflect an understanding that the purchaser was to increase the fleet by 60 tractors per year. The purchaser, on the other hand, points to evidence that the parties deleted specific language in prior drafts of the stock purchase agreement referring to "growth" tractors and reflecting the specific

2

numbers of tractors to be purchased, which shows that the parties rejected the obligations sellers seek to impose now.

Reasonable minds could reach different conclusions after reviewing the documentary evidence. This uncertainty is compounded by the fact that the parties have provided conflicting testimony regarding their negotiations. On the record presented, the Court needs to weigh the evidence. Accordingly, a trial is necessary, and the cross-motions for summary judgment are denied.

## I.    BACKGROUND

This Memorandum Opinion addresses those facts necessary to resolve the issues presented in the cross-motions for summary judgment. The following facts are drawn from the verified pleadings and exhibits submitted with the parties' summary judgment papers.

### A.    The Stock Purchase Agreement

Plaintiff Schneider National Carriers, Inc. ("Schneider") is a large transportation company that provides a range of trucking, intermodal, and logistics services.[1] Watkins and Shepard ("W&S") was a Montana-based trucking company that specialized in transporting difficult-to-handle goods, such as furniture. On June 1, 2016, Schneider acquired W&S, its subsidiary Lodeso, and W&S's other

---

[1] The term "intermodal" refers to freight transport involving trucks and other modes of transportation. Compl. ¶12; Countercl. ¶ 18.

3

subsidiaries (collectively, the "Acquired Companies") from Raymond J. Kuntz and Steven B. Williamson (collectively, the "Sellers") pursuant to a Stock Purchase Agreement (the "SPA").[2]  Defendant and Counterclaim Plaintiff Kuntz is the designated Sellers' Representative in the SPA.  This Opinion refers to Defendant as the "Sellers."

Under the SPA, Schneider paid guaranteed consideration of $128.75 million for the Acquired Companies.[3]  Schneider also agreed to pay up to $40 million in "Annual Contingent Payments" payable in three installments of up to $13,333,333.33, contingent on meeting EBITDA targets for three year-long "Measurement Periods" for each of the three years after the transaction closed (the "Earnout").[4]  The EBITDA targets were $36, $46, and $59 million for the three Measurement Periods following the close of the transaction, respectively.[5]

Section 2.4(e) of the SPA provides that, after the transaction, Schneider, the Acquired Companies, and their affiliates have the right to operate the businesses "as they see fit," subject to certain operating covenants in Exhibit E to the SPA.

---

[2] The SPA is attached as Exhibit 1 to the Transmittal Affidavits of Elizabeth M. Taylor in support of Schneider's Motion for Summary Judgment ("Taylor Aff.").  The exhibits submitted in support of the Sellers' Motion for Summary Judgment are attached to the Transmittal Affidavits of Matthew L. Miller ("Miller Aff.").

[3] *See* SPA §§ 2.2 & 2.3; *see also id.* at SNC_010076853 (defining "Closing Payment").

[4] *Id.* § 2.4.

[5] *Id.* at SNC_010076855 (defining "EBITDA Target").

Section 2.4(e) also states that "there is no guarantee of any [Earnout payment]" and that Schneider "is not making nor has it made any representation or warranty to such Seller . . . as to the value to such Seller of the potential right to receive any [Earnout payment]."[6]

Exhibit E contains four operating covenants. Paragraph 1 to Exhibit E states that Schneider must, during each Measurement Period, "cause one or more of the Acquired Companies to acquire, in the aggregate, not less than sixty (60) class 8 tractors." (the "Tractor Acquisition Covenant").[7]

---

[6] *Id.* § 2.4(e). Section 2.4(e) states:

> During each Measurement Period, the Buyer shall operate the Acquired Companies and Lodeso in the manner provided for on **Exhibit E**. Each Seller acknowledges and agrees that (i) so long as the Buyer operates the Acquired Companies and Lodeso in such manner, the Buyer, the Acquired Companies and each of their respective Affiliates will have the right to otherwise operate their business as they see fit and will have no obligation (fiduciary or otherwise) to act in any manner in an attempt to protect or maximize any payments under this **Section 2.4**, (ii) any [Earnout payment] is contingent on the performance of the business of the Acquired Companies, and there is no guarantee of any [Earnout payment] . . . under this Agreement or otherwise; and (iii) the Buyer is not making nor has it made any representation or warranty to such Seller, and the Buyer expresses no opinion, as to the value to such Seller of the potential right to receive any [Earnout payment].

[7] SPA Ex. E. According to Schneider, a class 8 tractor is "essentially . . . the tractor that you would see hauling a 53-foot trailer down the highway." Dkt. 187, Tr. 7:21-23.

Paragraph 2 to Exhibit E requires Schneider to, during each Measurement Period, "work in good faith . . . to seek to capture synergies available to the Acquired Companies." (the "Synergy Covenant").[8]

The final paragraph in Exhibit E contains two covenants requiring Schneider to refrain from (1) transferring any material portion of the Acquired Companies' assets outside of the Acquired Companies (the "Non-Transfer Covenant"); and (2) materially changing the "type or nature" of any Acquired Company's business until the Measurement Periods ended (the "Business Continuity Covenant").[9]

---

[8] SPA Ex. E. The Synergy Covenant, in full, requires Schneider to:

> work in good faith with the Acquired Companies to seek to capture synergies available to the Acquired Companies as a result of becoming a subsidiary of the Buyer and its Affiliates, such as, by way of representative example, fuel cost savings, tire cost savings, equipment cost savings, insurance savings and access to the Buyer's and its Affiliates' driver recruiting and management capabilities, safety initiatives and purchasing power.

[9] In full, the final paragraph to Exhibit E states:

> In addition, except as the Buyer and Sellers' Representative may otherwise agree in writing, from the Closing Date through and including the last day of the final Measurement Period, the Buyer shall not, and shall not permit any of the Acquired Companies to reorganize, consolidate or otherwise take steps to sell, dispose or otherwise transfer any material portion of the assets of the Acquired Companies to an entity other than an Acquired Company or to materially alter or change the type or nature of any Acquired Company's business from the business conducted by the Acquired Companies immediately prior to the Closing.

*Id.*

6

In the event that Schneider violated any of the Exhibit E operating covenants, the Earnout would be due in full within five business days of the failure to operate pursuant to any operating covenant.[10]

Schneider seeks a summary judgment declaring that Schneider did not breach the Tractor Acquisition Covenant, the Synergy Covenant, the Business Continuity Covenant or the implied covenant of good faith and fair dealing.[11] The Sellers seek a summary judgment that Schneider breached the Tractor Acquisition Covenant and that Sellers are entitled to their reasonable attorneys' fees and expenses.

## B. The Negotiation History of the Transaction

Each side argues that the negotiating history and the conduct of the parties prior to the execution of the SPA mandate summary judgment in their favor. According to the Sellers, the parties discussed Schneider's purchasing 60 growth tractors each year for the Acquired Companies throughout the negotiating process: (1) during an initial exchange of projections; (2) during the drafting and execution of a letter of intent; and (3) during the negotiation of the SPA. Sellers also cite

---

[10] *Id.* § 2.4(f).

[11] Schneider has not moved for summary judgment on Sellers' claim for breach of the Non-Transfer Covenant. Schneider Opening Br. 2 n.1 (acknowledging that the Non-Transfer Covenant presents a material question of disputed fact because it is an open question whether the leasing of approximately 80 underutilized tractors from W&S to other divisions of Schneider constituted a breach of the Non-Transfer Covenant).

internal Schneider communications that Sellers argue reflect Schneider's understanding that it was required to provide 60 growth tractors. Schneider argues, however, the parties never reduced the concept of purchasing 60 growth tractors per Measurement Period into a binding operational covenant. On the contrary, Schneider argues that the negotiating history, evidenced by drafts of the SPA, shows that Schneider considered and rejected the concept of mandating the purchase of 60 growth tractors per Measurement Period.

### 1. The Confidential Information Memorandum and the Pre-Closing Projections

In 2015, the Sellers engaged Cascadia Capital, LLC ("Cascadia") to prepare a confidential information memorandum (the "CIM") and a supplemental package of financial information to market W&S to potential buyers.[12] The CIM contained financial projections, including EBITDA targets for 2016, 2017, and 2018 of approximately $36, $46, and $57 million.[13] These EBITDA targets closely approximated the eventual EBITDA targets for the Earnout of $36, $46, and $59 million.[14] A supplemental package of financial information sent to prospective

---

[12] Sellers' Opening Br. 8.

[13] *Id.* 9 & Miller Aff. Ex. 1 at ESI012GP_00013206 (projecting "Adjusted EBITDA").

[14] *See* Sellers' Opening Br. 15 ("The EBITDA targets, which were the same as those in the CIM rounded to the nearest million . . . ."); Schneider Ans. Br. 7 ("Sellers' Motion acknowledges that the CIM included projected EBITDA targets that eventually formed the basis for the Earn-Out targets of $36 million, $46 million, and $59 million that W&S failed to achieve.").

buyers contained projections for W&S's capital expenditures, which specifically detailed the number of "replacement" tractors and "growth" tractors to be purchased in 2016, 2017, and 2018.[15] According to the presentation, W&S projected purchasing 45 growth tractors in 2016, 60 growth tractors in 2017, and 60 growth tractors in 2018.[16] In addition to those presentations, W&S provided financial projections to Schneider that reflected a net increase of 60 tractors per year for the next three years.[17]

Schneider's internal communications evaluating the prospective transaction assumed that W&S's fleet of tractors would grow to achieve additional EBITDA and, in certain scenarios, assumed growth by 60 tractors per year. For example, a Schneider email in January 2016 indicates that Schneider anticipated that W&S would grow after the transaction through purchasing tractors.[18] A slide prepared by Schneider and circulated in February 2016 reflected "Growth capex is assumed to be 60 tractors . . . per year," and calculated revenue, depreciation, and EBITDA

---

[15] Sellers' Opening Br. Ex. 2 at ESI012GP_00013225.

[16] *Id.* According to Kuntz, Christian Schiller of Cascadia testified that the presentation projected purchasing 45 growth tractors in 2016 because W&S had already begun to purchase tractors at the end of 2015. *See* Sellers' Opening Br. 9-10 n.30.

[17] Miller Aff. Ex. 3 at Tab 2016 Budget p.3, Tab 2017 Projection p. 3, Tab 2018 Projection p.3 (showing a 60 tractor per year increase from 630 tractors in 2016 at the beginning of 2016 to 810 tractors at the end of 2018).

[18] Miller Aff. Ex. 4 ("Prelim view shows large EBITDA growth coming through purchase of Tractors.").

9

projections based on an assumed "60 growth tractors" per year.[19]   Schneider's projections prior to closing the transaction also assumed that Schneider would purchase 60 growth tractors annually.[20]

## 2.    The Letter of Intent

On March 7, 2016, Schneider sent W&S a non-binding letter of intent for a transaction which proposed a purchase price of $145 million in guaranteed consideration and up to $30 million of earnout payments contingent upon W&S hitting certain EBITDA targets.[21]   One week later, Schneider sent W&S a revised letter of intent that contained certain "assumptions," including "[s]ufficient tractor and trailer capital to support profitable growth; a minimum of 60 tractors and sufficient trailers for each 12 month EBITDA Measurement Period."[22]   The parties dispute whether this addition contemplated growth tractors or merely the acquisition of 60 tractors per measurement period.[23]

---

[19] Miller Aff. Ex. 6 at SNC_010091047.

[20] *See* Miller Aff. Ex. 28 at SNC_0100038875 & Miller Aff. Ex. 29 at 37 (entitled "Buffalo Estimated Capex Projections").

[21] Miller Aff. Ex. 8.

[22] Miller Aff. Ex. 10 at SNC_010007028-9.

[23] *See* Miller Aff. Ex. 40, Kuntz Tr. 198:9-200:9 (testifying that he requested that the letter of intent include a guarantee of 60 growth tractors); Taylor Aff. Ex. 51, Gasick Tr. 109:21-110:11 (Schneider executive testifying that the "minimum of 60 tractors" language in the letter of intent was not a reference to growth tractors).

10

On March 18, 2016, the parties executed a final letter of intent. The final letter of intent provided for total consideration of $175 million, consisting of (1) $85 million at closing, (2) three guaranteed payments of $20 million each year for three years after closing, and (3) three contingent payments of up to $10 million for achieving at least 80% of EBITDA targets of $36 million within 12 months after closing, $46 million within 24 months after closing, and $59 million within 36 months of closing.[24] In addition, the final letter of intent updated the "assumptions" to an acknowledgment that the final contract would contain "mutually agreeable operational covenants," which included the same provision for "[s]ufficient tractor and trailer capital to support profitable growth; a minimum of 60 tractors and sufficient trailers for each 12 month EBITDA Measurement Period."[25]

After the parties executed the letter of intent, Schneider management made a presentation to its Board of Directors and submitted a Hart-Scott-Rodino filing to the FTC, both of which included slides projecting future EBITDA based on an

---

[24] Miller Aff. Ex. 13 at CASCH_00010465.

[25] *Id.* at CASCH_00010468.

assumption that Schneider would add 60 growth tractors per year after the transaction.[26]

### 3. The SPA Negotiations

#### a. The parties exchange initial drafts of the SPA.

On April 8, 2016, Schneider circulated the first draft of the SPA. The first draft of the SPA contained the same payment terms as the final letter of intent, but did not contain any provision obligating Schneider to purchase tractors.[27] Instead, the initial draft of the SPA contained buyer-friendly language permitting Schneider to operate the business "as [it] saw fit," without any "obligation (fiduciary or otherwise) to act in any manner in an attempt to protect or maximize" the

---

[26] Miller Aff. Ex. 15 at SNC_010028553 ("60 tractors/180 trailers of growth assumed annually"); Taylor Aff. Ex. 66 (projecting EBITDA based on "60 growth tractors"). The parties contest the significance of the projections submitted to the FTC with Schneider's Hart-Scott-Rodino filing. Sellers argue that the filing reflected a "commit[ment] to increase W&S's tractor fleet by 60 tractors each year." Sellers Opening Br. 3; *see also id.* at 18. In support of that argument, Sellers cite the deposition testimony of Paul Kardish, the former general counsel of Schneider, who testified that, when the Hart-Scott-Rodino filing was provided to the FTC in April 2016, Schneider understood that it would need to buy 60 growth tractors in each of the Measurement Periods in order to enable W&S to meet the projections described in the filing. Miller Aff. Ex. 50, Kardish Tr. 101:5-18. Schneider argues, however, that the Hart-Scott-Rodino filing was not a commitment and that Kardish never testified that "Schneider understood that it was required to grow W&S's fleet." Schneider Ans. Br. 10-11.

[27] Miller Aff. Ex. 16 §§ 2.1-2.4; *see also* Schneider Ans. Br. 17 (agreeing with Schneider's characterization of the April 8, 2016 initial draft of the SPA).

Earnout.[28]  On April 21, 2016, Sellers circulated a second draft of the SPA, which struck Schneider's buyer-friendly operating language.[29]

The Sellers' second draft requested that Schneider propose "post-closing operational covenants," including a covenant "to continue to operate the business on a stand-alone, independent basis" and a "covenant to provide appropriate equipment purchase support."[30]  The Sellers argue that the latter covenant was a reference to the obligation to purchase 60 growth tractors as reflected in the final letter of intent; Schneider argues, however, that subsequent negotiations severed any connection between the covenant to purchase equipment in the letter of intent and any covenant in the executed SPA.[31]

### b.    The parties meet to negotiate the SPA.

After the parties executed the letter of intent, the parties met in person and had several teleconferences negotiating the SPA.  The parties dispute what happened at each meeting.  Participants in these discussions from Sellers and Cascadia have, in the main, testified that they repeatedly addressed whether Schneider would provide 60 growth tractors per Measurement Period.  By contrast, Schneider's employees have uniformly testified that they have no recollection of

---

[28] Miller Aff. Ex. 16 § 2.4(e).

[29] Miller Aff. Ex. 20 § 2.4(g).

[30] *Id.* at 19.

[31] Sellers' Opening Br. 20; Schneider Ans. Br. 18

13

the Sellers or Cascadia pushing for a covenant requiring 60 growth tractors so that W&S could meet the EBITDA targets.

### i.     The parties meet in Green Bay.

On May 3, 2016, Schneider (represented by Mark Rourke, Schneider's then-COO, Robert Elkins, a senior executive responsible for integration, and George Grossardt, senior vice president of Corporate Development), W&S (represented by Kuntz), and Cascadia (represented by Christian Schiller and Greg Hill) met in Green Bay, Wisconsin to discuss the transaction.  The parties agree that they discussed the Earnout at the meeting, but they differ as to whether Kuntz affirmatively stated that he needed growth tractors to meet the EBITDA targets.

According to Sellers, Kuntz explained that W&S needed additional tractors to achieve the Earnout.  Sellers cite to Hill's contemporaneous notes, which were shared with Schneider the following day.  Under a heading entitled "Define and Simplify Earn-Out," the notes state: "Ray [Kuntz] began this point with a statement . . . . We will start adding trucks."[32]  Another portion of the notes states: "If W&S needs more trucks they would be able to provide it and make sure that W&S is successful."[33]  Schiller testified that these notes reflected that Schneider

---

[32] Miller Aff. Ex. 21 at SNC_010086812.  *See also* Miller Aff. Ex. 41, Schiller Tr. 156:22-157:16 (testifying that "the earn out and the achievement of the earn out was based on the ability to add trucks, that is why it was first").

[33] Miller Aff. Ex. 21 at SNC_010086812.

represented that it was willing to provide all of the trucks needed for W&S to grow.[34]

In contrast to Schiller's testimony, Grossardt testified that he had no recollection of Kuntz addressing W&S's need for growth trucks to satisfy the Earnout at the May 3, 2016 meeting in Green Bay.[35]  Schneider also disputes Schiller's recollection that Schneider agreed to provide any trucks that W&S needed to grow.[36]

### ii.    Kuntz and Rourke discuss shifting consideration into the Earnout.

On May 10, 2016, Kuntz and Rourke spoke telephonically and agreed to modify the consideration for the transaction, as well as its structure.  The parties agree that they reduced the total consideration and shifted some of the consideration into the Earnout so that $68,750,000 would be paid immediately and $40,000,000 would be paid as an earnout.[37]

Kuntz and Rourke have different recollections of this discussion.  According to the Sellers, Kuntz only agreed to shift consideration to the Earnout if Schneider

---

[34] Miller Aff. Ex. 41, Schiller Tr. 158:20-24 (testifying that Schneider indicated that they "weren't going to hold back on providing the trucks for [W&S's] business plan to be successful.  They kind of acted like that was a fait accompli, no problem.").

[35] Schneider Ans. Br. 19 (citing Taylor Aff. Ex. 48 at 131:4-133:10).

[36] Miller Aff. Ex. 21 at SNC_010086812 (indicating that Schneider was concerned about "underutilization of the assets").

[37] Sellers' Opening Br. 22-23; Schneider Ans. Br. 19-20.

would agree to provide 60 additional tractors with drivers per Measurement Period. Kuntz recalls that Rourke's response was, effectively, "We will give you the 60 trucks a year. We're an operations company. We will get you drivers."[38] Rourke, on the other hand, testified that the parties agreed upon a new transaction structure because W&S missed its financial projections for the first two quarters of 2016.[39] Rourke and Kuntz agreed to the new consideration structure the following day via email. The email did not mention the post-acquisition purchase of growth tractors for W&S.[40]

### iii. The parties hold an "all-hands" call.

On May 11, 2016, the parties held an "all hands" call involving many representatives from the parties and their counsel.[41] Witnesses from each side have differing recollections of the discussion.

Hutchinson, lead counsel for the Sellers, testified that the parties discussed operational covenants and that there were "specific conversations regarding the

---

[38] Miller Aff. Ex. 40, Kuntz Tr. 190:5-23.

[39] Taylor Aff. Ex. 42, Rourke Tr. 145:24-146:8 ("What I recall was this discussion of giving the opportunity to make up for the loss of performance . . . . We talked about an opportunity to recover based upon performance, recover being the change in purchase price."). Sellers argue that this statement by Rourke reflects his agreement to provide the trucks and the drivers, as Kuntz testified. Sellers' Opening Br. 23.

[40] Miller Aff. Ex. 22.

[41] Miller Aff. Ex. 23.

16

importance of the trucks."[42] According to Hutchinson, both he and Kuntz expressed "that it was essential . . . that there be an incremental 60 trucks over the . . . existing fleet to have the sufficient resources to achieve the growth to meet the EBITDA targets to then meet the earn-out targets."[43] Conversely, Schneider has submitted a sworn affidavit from David Whelpley, counsel for Schneider, which seems to dispute Hutchinson's testimony. The affidavit cites Hutchinson's testimony and states:

> I was not a witness nor a party to any conversations with James Hutchinson, Goodwin Procter, or Ray Kuntz in which I recall that it was expressed that W&S could only achieve the EBITDA targets in the Stock Purchase Agreement if Schneider were to increase its existing fleet by 60 tractors a year.[44]

### c. The parties exchange final drafts of the SPA.

On May 13, 2016, Schneider provided a revised draft of the SPA to the Sellers.[45] In this version, Schneider replaced language indicating that it would "operate the Acquired Companies in the manner provided for on Exhibit A," with language providing that it would "have the right to operate their business as they see fit and will have no obligation (fiduciary or otherwise) to act in any manner in

---

[42] Miller Aff. Ex. 47, Hutchinson Tr. 55:7-56:2.

[43] *Id.*

[44] Taylor Aff. Ex. 53 ¶¶ 6-7. *See also* Miller Aff. Ex. 23 at CASCH_00006200 (listing Whelpley among the attendees for the May 11, 216 "all hands call").

[45] Taylor Aff. Ex. 15.

an attempt to protect or maximize any [Earnout] payments."[46]   In this draft, Schneider also proposed language regarding assumptions for calculating EBITDA during a Measurement Period, including that there would be "[c]apital expenditure equivalent to 60 class 8 tractors" and that there would be "[a]ssets includ[ing] 760 tractors for the first Measurement Period, 820 tractors for the second Measurement Period, and 880 tractors for the third Measurement Period."[47]

In their response to the May 13 version of the SPA, Sellers provided a list of material issues.  Sellers commented that the "Post-Closing earn-out covenants remain limited and Buyer favorable," citing Schneider's proposed language to "operate the business as it sees fit" and that Schneider would have no obligation to protect or maximize the Earnout.[48]  Schneider responded that it would be "willing to agree that any of the following actions [would] accelerate the unpaid earn-out: (1) failure by the Acquired Companies to acquire sixty (60) tractors during each Measurement Period and (2) any transfer, sale or disposition during any Measurement Period of a material portion of the Acquired Companies' assets (determined on a consolidated basis)."[49]

---

[46] Taylor Aff. Ex. 15 at KUNTZ_00000085.

[47] *Id.* at KUNTZ_00000145.

[48] Miller Aff. Ex. 26 at KUNTZ_00000262.

[49] *Id.*

On May 20, 2016, Schneider circulated a revised SPA, taking into account the parties' negotiations over the list of material issues to the May 13 SPA. This version retained language allowing the Buyer to operate the acquired businesses as it saw fit and providing no obligation to protect or maximize the Earnout. This version also introduced, for the first time, two operating covenants attached to the SPA as Exhibit D.[50] One covenant required Schneider to "cause one or more of the Acquired Companies to acquire, in the aggregate, sixty (60) class 8 tractors" during each Measurement Period.[51] This version of the SPA, however, also deleted the assumption for measuring EBITDA that there would be "[c]apital expenditure equivalent to 60 class 8 tractors" and that assets would "include 760 tractors for the first Measurement Period, 820 tractors for the second Measurement Period and 880 tractors for the third Measurement Period."[52] The Sellers argue that the addition of the operating covenants in Exhibit D and the deletion of the assumptions for the calculation of EBITDA was intended to simplify the concept that 60 growth trucks would be purchased per measurement period.[53]

---

[50] Miller Aff. Ex. 27 at KUNTZ_00000598.

[51] *Id.*

[52] *Id.* at KUNTZ_00000591.

[53] Sellers Opening Br. 28-29 (citing Miller Aff. Ex. 47, Hutchinson Tr. 103:14-21, Miller Aff. Ex. 45, Grossardt Tr. 148:16-150:24).

On May 25, 2016, Sellers responded with a proposed revision to the operating covenants, expanding the tractor acquisition requirement. Sellers sought to require Schneider to "cause one or more of the Acquired Companies to acquire, in the aggregate, not less than sixty (60) class 8 tractors (the "Tractors") and such greater number of Tractors and other equipment necessary to the accommodate the Acquired Companies' operations, including any growth related thereto."[54] Sellers also included eight separately numbered paragraphs containing additional operating covenants for the Acquired Companies, with restrictions on things such as employee compensation, reassignment of personnel, cutting staff, and closing a key terminal.[55] In the next draft of the Agreement, Schneider struck the language requiring Schneider to acquire "such greater number of Tractors and other equipment necessary to accommodate the Acquired Companies' operations, including any growth related thereto," as well as seven of the eight newly proposed operating covenants,[56] which were not included in the final version of the SPA. The SPA was executed on June 1, 2016, and the transaction closed that same day.[57]

---

[54] Taylor Aff. Ex. 19 at KUNTZ_00002951.

[55] *Id.*

[56] Taylor Aff. Ex. 20 at KUNTZ_00001674.

[57] Taylor Aff. Ex. 1 at SNC_010076851.

20

## C.     Schneider's Post-Closing Conduct

Sellers contend two communications during the first Measurement Period show that Schneider knew the Tractor Acquisition Covenant was intended to require the purchase of growth tractors. Shortly after the transaction closed, W&S began requesting funds for additional tractors. Schneider informed W&S that it would have to go through a formal process known as a Capital/Lease/Expenditure Request ("CLER") in order for Schneider to provide the funds for the tractors.[58] On June 10, 2016, Aaron Cousineau, Schneider's controller, wrote to Robert Elkins with a draft of an "abbreviated CLER" for 26 tractors, and notified him that he "included . . . verbiage [in the CLER] calling out this will be 26 of the 60 growth tractors[.]"[59] The CLER itself states that the "[t]ractors will count as 26 of the 60 growth tractors committed by Schneider during the first 12 month period (06/01/2016 – 05/31/2017)."[60] Cousineau testified that he was not involved in the contract negotiations and had never seen the SPA until after sending the email.[61]

---

[58] Miller Aff. Ex. 32.

[59] Miller Aff. Ex. 33 at SNC_010038779.

[60] *Id.* at SNC_010038783.

[61] Taylor Aff. Ex. 57, Cousineau Tr. 20:24-21:21 (testifying that Cousineau was not involved in "any of the negotiation or the legal contracts of the purchase agreement" and that he only saw the SPA in "probably 2017 or 2018").

The final version of the CLER stated that "[g]rowth capital, when required, will be tracked against earn out target of 60 tractors ($7.5M) per 12 month period."[62]

Sellers also point to an email in the middle of the first Measurement Period. On January 30, 2017, Michael Gasick, a Schneider senior vice president, emailed Elkins stating:

> We need to prepare you to have a conversation with Ray [Kuntz] about the contractual 60 class 8 tractors that were part of the SPA. We will likely need a waiver from him that he agrees he does not need the 60 tractors . . . . The SPA is clear that we need to provide the 60 class 8 tractors in each of the three years of the earn out. We all know he does not need them, so he needs to waive this requirement for the first 12 month period. The waiver needs to happen no later than June.[63]

Gasick testified that this email was not a reference to any obligation to provide 60 growth tractors to W&S's fleet in each Measurement Period, and that he never understood that the SPA obligated Schneider to do so.[64]

Over the three Measurement Periods, Schneider purchased at least 60 tractors, but disposed of more than 60 tractors, thereby reducing the total number of tractors in the W&S tractor fleet.[65] During the first Measurement Period, Schneider caused W&S to acquire 71 class 8 tractors and disposed of 108 class 8

---

[62] Taylor Aff. Ex. 58 at SNC_010106479.

[63] Miller Aff. Ex. 35.

[64] Taylor Aff. Ex. 51, Gasick Tr. 152:18-153:6, 158:11-21; *see also id.* at 40:3-14; 109:21-110:11.

[65] Schneider Ans. Br. 29-30 ("Schneider acknowledges that it did not *grow* W&S's 'fleet' by 60 tractors during any of the Measurement Period") (emphasis in original).

tractors, causing a net decrease of 134.[66]  During the second Measurement Period, Schneider caused W&S to acquire 102 class 8 tractors and disposed of 104 class 8 tractors, causing a net decrease of 2 class 8 tractors.[67]  During the third Measurement Period, Schneider caused W&S to acquire 137 class 8 tractors and disposed of 199 class 8 tractors, causing a net decrease of 62 class 8 tractors.[68] Schneider also leased tractors from W&S's fleet to other Schneider divisions in the first Measurement Period.[69]

During each of the three years following the acquisition, W&S missed its budgeted revenues and EBITDA targets, and was ultimately shut down.[70]  The parties dispute the cause.  Sellers argue that the cause was Schneider's deliberate decision not to purchase sufficient tractors for EBITDA growth.  Sellers also deny that Schneider attempted to capture synergies pursuant to the Synergy Covenant in good faith and argue that Schneider sabotaged W&S by preventing it from satisfying customer demand, reducing its operations, and ordering its sales

---

[66] Miller Aff. Ex. 38 (showing changes from 836 total class 8 tractors in May '16 to 799 in June '17).

[67] *Id.* (showing changes from 799 class 8 tractors in June '17 to 797 in June '18).

[68] *Id.* (showing changes from 797 class 8 tractors in June '18 to 735 in June '19).

[69] *Id.*

[70] Taylor Aff. Ex. 32 (describing the shutdown of Schneider's "First to Final Mile" service); *see also* Schneider Opening Br. 1 (describing the First to Final Mile service as "encompass[ing] newly acquired W&S"), Schneider Ans. Br. 30-33 (describing W&S's performance after the transaction).

representatives to not take on new business.[71] Schneider contends that W&S had a high number of trucks that were not in use, so purchasing additional trucks would have been futile. Schneider also argues that it sought to and successfully realized synergies after the acquisition, including by retaining and actively recruiting drivers.[72]

## D. Procedural History

On October 4, 2017, Schneider initiated this litigation seeking a declaratory judgment that the Earnout had not been accelerated and that Schneider complied with the Tractor Acquisition Covenant (Compl. Count I).[73] The Sellers counterclaimed, contending that Schneider breached the SPA (Countercl. Count I) or breached the implied covenant of good faith and fair dealing inherent in the SPA

---

[71] Sellers' Opening Br. 32-36, Sellers' Ans. Br. 48-50.

[72] *See* Taylor Aff. Ex. 24 at SNC_010028897 (projecting post-acquisition synergies in July 2016); Ex. 25 at SNC_010057038 (stating that "[s]ynergy realization has been higher than expected" and observing synergies of over $3 million in January 2017), Ex. 26 at SNC_010036245 (stating that "synergies have exceeded expectations with additional opportunities identified" and observing synergies of over $6 million in April 2017), Ex. 27, Elkins Tr. 283:4-9 (testifying that Schneider transferred driver recruiting to Green Bay, Wisconsin, thereby providing W&S access to its capabilities). *See also id.* at 360:20-361:7 (testifying that Schneider sought to retain W&S drivers by permitting W&S drivers to keep pets in their tractors even though Schneider's drivers were prohibited from keeping pets, and stating "we communicated . . . to all the drivers that did have pets, that they could retain and keep those pets; in fact, went as far as to say if their pet passed away, they could replace the pet").

[73] Compl. ¶¶ 14-15.

(Countercl. Count II).[74] The parties filed cross-motions for judgment on the pleadings. Schneider argued, as it does here, that the Tractor Acquisition Covenant only obligated it to purchase a total of 60 tractors, not 60 growth tractors, thus entitling Schneider to a declaratory judgment that it had not breached the SPA.[75] The Sellers argued that they were entitled to judgment on the pleadings on their claims for breach of contract and breach of the implied covenant of good faith and fair dealing. According to the Sellers, the Tractor Acquisition Covenant obligated Schneider to purchase 60 growth tractors per Measurement Period and Schneider was not permitted to lease W&S's tractors to other Acquired Companies.[76]

The Court denied the cross-motions for judgment on the pleadings and held that the parties had "advance[d] reasonable but conflicting interpretations of the contractual provisions at issue in the pending cross-motions."[77] The Court concluded that both interpretations were "commercially reasonable," and that, "[t]o the extent some issues ultimately may be decided as a matter of law, a fuller development of the facts should serve to clarify the law or help the Court

---

[74] Countercl. ¶¶ 56-71.

[75] *See* Dkt. 33.

[76] *See* Dkt. 58.

[77] Dkt. 74 ¶ 5; *see also id.* ¶ 8 ("Schneider and Kuntz each offers a reasonable interpretation of the contract language.").

determine its application to this dispute."[78]  The Court further held that, "[b]ecause both parties assert reasonable interpretations of the express terms of the contract, the holes that the implied covenant may or may not fill cannot be determined at this stage."[79]

## II.    STANDARD OF REVIEW

Under Court of Chancery Rule 56, summary judgment "shall be rendered forthwith" if "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law."  Ct. Ch. R. 56(c).  "When opposing parties make cross motions for summary judgment, neither party's motion will be granted unless no genuine issue of material fact exists and one of the parties is entitled to judgment as a matter of law."[80]  The Court "must view the facts in the light most favorable to the non-moving party."[81]  Any request for summary judgment "'must be denied if there is any reasonable hypothesis by

---

[78] *Id.* ¶¶ 8, 14.

[79] *Id.* ¶ 13.

[80] *Shuba v. United Servs. Auto Ass'n*, 77 A.3d 945, 947 (Del. 2013) (internal citations omitted).

[81] *Merrill v. Crothall-Am., Inc.*, 606 A.2d 96, 99 (Del. 1992).

26

which the opposing party may recover, or if there is a dispute as to a material fact or the inferences to be drawn therefrom.'"[82]

"There is no 'right' to a summary judgment."[83] Accordingly, "the court may, in its discretion, deny summary judgment if it decides upon a preliminary examination of the facts presented that it is desirable to inquire into and develop the facts more thoroughly at trial in order to clarify the law or its application."[84]

## III. ANALYSIS

This opinion first considers the parties' motions for summary judgment on whether Schneider breached the Tractor Acquisition Covenant (Compl. Count I & Countercl. Count I). It then considers Schneider's motion for summary judgment relating to the Synergy Covenant and Business Continuity Covenant (Compl. Count I), followed by Schneider's motion for summary judgment on the Sellers' claim for a breach of the implied covenant of good faith and fair dealing (Countercl. Count II).

---

[82] *In re El Paso Pipeline P'rs, L.P. Deriv. Litig.*, 2014 WL 2768782, at *8 (Del. Ch. June 12, 2014) (quoting *Vanaman v. Milford Mem'l Hosp., Inc.*, 272 A.2d 718, 720 (Del. 1970)).

[83] *Telxon Corp. v. Meyerson*, 802 A.2d 257, 262 (Del. 2002).

[84] *In re El Paso*, 2014 WL 2768782, at *9 (citations omitted); *see also The Williams Cos. v. Energy Transfer LP*, 2020 WL 3581095, at *11 (Del. Ch. July 2, 2020) ("[T]he court in its discretion may determine that a trial record is necessary in the interests of justice.").

## A. The Tractor Acquisition Covenant

In denying cross-motions for judgment on the pleadings, the Court held that the Tractor Acquisition Covenant was ambiguous. In addition to advancing their respective textual interpretations, each side now argues that the evidentiary record establishes that their interpretation is the proper one, thus requiring summary judgment in their favor. "[S]ummary judgment may not be awarded if the language is ambiguous and the moving party has failed to offer uncontested evidence as to the proper interpretation."[85] Both parties have offered contested evidence as to the proper interpretation of the Tractor Acquisition Covenant. The documentary record contains elements that support each side's position on the Tractor Acquisition Covenant, and the witness testimony conflicts. Thus, summary judgment cannot be granted.

### 1. The Tractor Acquisition Covenant could have obligated Schneider to add 60 growth tractors to the Acquired Companies' fleet per Measurement Period.

The Tractor Acquisition Covenant required Schneider to "cause one or more of the Acquired Companies to acquire, in the aggregate, not less than sixty (60) class 8 tractors." According to Schneider, it required Schneider "to provide 60 class 8 tractors gross to the Acquired Companies during each Measurement

---

[85] *GMG Capital Invs., LLC v. Athenian Venture P'rs I, L.P.*, 36 A.3d 776, 784 (Del. 2012).

Period," not that it was required to "increase the fleet of the Acquired Companies by 60 or more class 8 tractors during each Measurement Period."[86] Schneider says that its interpretation makes commercial sense because there was a possibility that Lodeso, one of the Acquired Companies, would require tractors eventually, so the operating covenant permitted Schneider to acquire the 60 tractors for any of the Acquired Companies rather than just W&S.[87] Schneider also says that the negotiating history of the Tractor Acquisition Covenant shows that it was not intended to mandate 60 growth tractors per Measurement Period because Schneider inserted the specific language at issue and would not have wanted to bind itself to adding growth tractors. Schneider points to more specific language in prior drafts of the SPA that would have required Schneider to purchase growth tractors but was ultimately deleted from the contract.[88] Schneider also claims that there is no number from which Schneider could have calculated whether it had purchased 60 growth tractors per Measurement Period.[89] Schneider then advances a textual argument that the plain meaning of "in the aggregate" does not mean "net increase or decrease" anywhere else in the SPA.

---

[86] Schneider Opening Br. 23.

[87] *Id.* 26-27.

[88] *Id.* 31-34.

[89] *Id.* 34-38.

These points support Schneider's position, but this evidence is contested, and Sellers' interpretation of the Tractor Acquisition Covenant remains viable at trial. Sellers have submitted evidence showing the parties agreed that Schneider would purchase 60 growth tractors per Measurement Period, including the projections exchanged by the parties reflecting that W&S would grow its fleet by 60 tractors per year, as well as Schneider's internal communications after the close of the transaction. Even if this Court disregards these categories of evidence, as Schneider urges, there is still a material issue of fact as to whether the parties agreed that Schneider would purchase 60 growth tractors for the Acquired Companies and whether that agreement was simplified into the Tractor Acquisition Covenant.[90]

---

[90] In its initial briefing, Schneider appeared to argue that this Court could not consider the projections that contemplated acquiring 60 growth tractors every year after the acquisition because of a provision that disclaims reliance by Schneider on projections, *see* Schneider Opening Br. 38-40 (arguing that the projections "are irrelevant to the question at hand") (citing SPA § 4.28(a)), and that this Court should not consider post-merger communications as evidence of the intended meaning of the SPA. *See* Schneider Ans. Br. 48-49 ("the post-closing conduct highlighted by Sellers is not relevant"). In its Reply Brief, however, Schneider concedes that the Court may consider the projections and post-closing communications as evidence of the intended scope of the Operating Agreement and these categories of evidence should only be afforded limited weight. Schneider Reply Br. 23-24 ("Schneider does not assert that these provisions prohibit the Court as a matter of evidentiary law from reviewing the financial projections. Rather, the integration and anti-reliance clauses reflect the parties' mutual understanding that the financial projections exchanged cannot be used to ratchet up the requirements of Exhibit E beyond what the parties agreed to."); *id.* 25 ("Delaware law is clear that the parties' intent is gauged at the time of contracting. Therefore, these emails should not be granted undue weight given that they are outside of the relevant time period.").

By the Sellers' telling, the parties reached an agreement during the negotiations leading up to the execution of the SPA that Schneider would purchase 60 growth tractors per Measurement Period for the Acquired Companies. Schiller, Kuntz, and Hutchinson all testified to that effect based on meetings that occurred in May 2016.[91] Drawing all reasonable inferences in favor of the Sellers, as I must in evaluating Schneider's motion for summary judgment, it is possible to find that the Tractor Acquisition Covenant was intended to memorialize that promise. Schneider's representatives offered conflicting testimony. Therefore, ultimate resolution of this issue may turn on credibility determinations, which are not appropriate at the summary judgment stage.[92]

---

As Schneider acknowledges, the Court is not precluded from considering this evidence at trial, so long as its relevance is adequately established. *See Eagle Indus., Inc. v. DeVilbiss Health Care Inc.*, 702 A.2d 1228, 1233 n.11 (Del. 1997) ("[R]elevant extrinsic evidence is that which reveals the parties' intent at the time they entered into the contract. In this respect, backward-looking evidence gathered after the time of contracting is not usually helpful."); *id.* 1233 & n.10 (holding that a court "may consider evidence of prior agreements and communications of the parties as well as trade usage or course of dealing" even where the parties' contract contains "a routine integration clause").

[91] *See, e.g.*, Miller Aff. Ex. 40, Kuntz Tr. 190:8-23 (testifying that Rourke promised him growth tractors and drivers on May 10, 2016); Miller Aff. Ex. 41, Schiller Tr. 158:21-24 (testifying that Schneider indicated that they "weren't going to hold back on providing the trucks for [W&S's] business plan to be successful. They kind of acted like that was a fait accompli, no problem.").

[92] "If the matter depends to any material extent upon a determination of credibility, summary judgment is inappropriate." *Cerberus Intern., Ltd. v. Apollo Mgmt., L.P.*, 794 A.2d 1141, 1150 (Del. 2002).

The drafting history also does not conclusively establish Schneider's claim to summary judgment. Although the parties struck proposed language from the Tractor Acquisition Covenant that could be interpreted to require Schneider to provide growth tractors, it is also possible that the deleted language only required Schneider to provide additional growth tractors in addition to the 60 tractors already required under the Tractor Acquisition Covenant.[93] Schneider's motion for summary judgment on the Tractor Acquisition Covenant issue is denied.

> **2. The Tractor Acquisition Covenant could have obligated Schneider only to purchase 60 total tractors across all of the Acquired Companies per Measurement Period.**

Sellers' motion for summary judgment on the Tractor Acquisition Covenant must be denied for the same reason that Schneider's motion is denied. Sellers argue that the extrinsic evidence "overwhelmingly" demonstrates that the parties intended that W&S's fleet of tractors would grow by 60 tractors per year for three years after the close of the transaction.[94] Sellers also argue that Schneider never communicated to Sellers they held a different understanding of the contract's meaning and, therefore, the "forthright negotiator doctrine" precludes any

---

[93] *See* Sellers' Opening Br. 29-30 (arguing that the deletion of the phrase "such greater number of Tractors and other equipment necessary to accommodate the Acquired Companies' operations, including any growth related thereto" from the May 25, 2016 draft of the SPA meant that the parties considered and rejected obligating Schneider to purchase growth tractors for the acquired companies in addition to the 60 tractors already specified in the contract).

[94] *Id.* 37, 39-48.

judgment in Schneider's favor.[95]  Lastly, like Schneider, Sellers also reiterate the textual argument that the SPA required the purchase of 60 growth tractors per Measurement Period.[96]

These arguments do not establish Sellers' claim for judgment as a matter of law.  The "forthright negotiator" doctrine can be applied if "the extrinsic evidence does not lead to a single, commonly held understanding of a contract's meaning."[97] Under those circumstances, the Court may "consider the subjective understanding of one party that has been objectively manifested and is known or should be known by the other party."[98]

Sellers are not entitled to summary judgment because Schneider has presented countervailing evidence creating a genuine issue of material fact over what the parties intended the Tractor Acquisition Covenant to mean.  Drawing all reasonable inferences in favor of Schneider, the deletion of any reference to "growth" tractors during the exchange of drafts of the SPA supports Schneider's interpretation that it was only obligated to provide 60 class 8 tractors during each Measurement Period, regardless of whether they were replacement or growth

---

[95] *Id.* 48-49.

[96] *Id.* 50-52.

[97] *United Rentals, Inc. v RAM Hldgs., Inc.,* 937 A.2d 810, 835-36 (Del. 2007).

[98] *Id.* at 836.

tractors.[99] That interpretation finds support from Schneider's witnesses, who have generally testified that they do not recall that the Sellers demanded growth tractors in negotiations regarding the SPA.[100] In addition, even if this Court were to consider the post-closing email communications as evidence of the parties' intentions regarding the SPA, Schneider has offered evidence to undermine the probative value of those emails. According to Schneider, one of the emails was authored by someone with no connection to the pre-merger negotiations of the SPA, and the author of the other email testified that he was not requesting a waiver of "the obligation to grow [W&S's] fleet by 60 tractors each measurement period."[101] Because the weight of the extrinsic evidence remains to be evaluated,

---

[99] *See* Taylor Aff. Ex. 19 at KUNTZ_00002951.

[100] *See, e.g.*, Taylor Aff. Ex. 53 ¶¶ 6-7 (Whelpley's affidavit stating "I was not a witness nor a party to any conversations with James Hutchinson, Goodwin Procter, or Ray Kuntz in which I recall that it was expressed that W&S could only achieve the EBITDA targets in the Stock Purchase Agreement if Schneider were to increase its existing fleet by 60 tractors a year"); Taylor Aff. Ex. 42, Rourke Tr. 146:1-8 (testifying that the consideration structure for the SPA was changed because of W&S's failure to meet its financial projections, not because W&S agreed to provide additional growth tractors). Sellers argue that the fact that Schneider employees fail to recall is insufficient to raise a disputed material issue of fact. Sellers' Reply Br. 15-23. However, Schneider has cited affirmative testimony indicating that their employees had a different understanding of the SPA. *See id.* (contesting Kuntz's recollection of the negotiation relating to the Earnout); Taylor Aff. Ex. 50, Rourke 30(b)(6) Tr. 87:25-88:10 (testifying that the SPA was satisfied so long as it acquired 60 replacement or growth tractors); Taylor Aff. Ex. 51, Gasick Tr. 40:9-14 (testifying that he never had the understanding that Schneider had agreed to provide 60 growth tractors in each of the measurement periods).

[101] Taylor Aff. Ex. 57, 20:17-21:21, Taylor Aff. Ex. 51, Gasick Aff. 152:18-153:6, 158:11-21.

the application of the "forthright negotiator" doctrine is more appropriately evaluated after trial.[102]

At bottom, granting Sellers' motion for summary judgment would require the Court to weigh evidence and to draw inferences in favor of the Sellers. "[T]he function of a judge in passing on a motion for summary judgment is not to weigh evidence and to accept that which seems to have to have the greater weight. His function is rather to determine whether or not there is any evidence supporting a favorable conclusion to the nonmoving party. When that is the state of the record, it is improper to grant summary judgment."[103] Sellers' motion for summary judgment is denied.

## B.     The Synergy Covenant

The Synergy Covenant required Schneider to:

work in good faith with the Acquired Companies to seek to capture synergies available to the Acquired Companies as a result of becoming a subsidiary of the Buyer and its Affiliates, such as, by way of representative example, fuel cost savings, tire cost savings, equipment cost savings,

---

[102] *United Rentals*, 937 A.2d at 836 (holding that the forthright negotiator doctrine may only be applied where "the extrinsic evidence does not lead to a single, commonly held understanding of a contract's meaning"). Thus, as Schneider points out, the forthright negotiator doctrine is typically only applied after the Court weighs extrinsic evidence at trial. *See, e.g.*, *id.* at 837 (applying the forthright negotiator doctrine after trial); *In re IAC/Interactive Corp.*, 948 A.2d 471, 501 n.123 (Del. Ch. 2008) (holding that trial testimony "support[ed] application of the forthright negotiator principle"); *Comrie v. Enterasys Networks, Inc.*, 837 A.2d 1, 13 (Del. Ch. 2003) (considering the forthright negotiator doctrine after trial).

[103] *Cont'l Oil Co. v. Pauley Petroleum, Inc.*, 251 A.2d 824, 826 (Del. 1969).

insurance savings and access to the Buyer's and its Affiliates' driver recruiting and management capabilities, safety initiatives and purchasing power.[104]

Schneider contends that it is entitled to summary judgment because it worked to obtain synergies in good faith, thus satisfying the Synergy Covenant. Schneider cites slide presentations and testimony reflecting that it specifically attempted to achieve the synergies enumerated in the Synergy Covenant.[105] Sellers, however, argue that Schneider failed to provide W&S sufficient tractors or drivers and that this Court cannot determine whether Schneider acted in good faith to achieve synergies before trial.

The Court cannot conclude as a matter of law at this stage that Schneider acted in good faith to capture synergies pursuant to the Synergy Covenant. Although Schneider has provided evidence that it achieved at least some synergies contemplated by the Synergy Covenant, Sellers have provided evidence that could support a finding that Schneider prevented W&S from achieving synergies, including by rerouting tractors to increase mileage and fuel costs or by simply not providing enough tractors to achieve the full synergies available to W&S post-

---

[104] SPA Ex. E.

[105] *See* Taylor Aff. Ex. 25 at SNC_010057038 (stating that "[s]ynergy realization has been higher than expected" as a result of "fuel savings," "tire purchasing and policies," and insurance savings), Ex. 26 at SNC_010036245 (stating that "synergies have exceeded expectations with additional opportunities identified" and observing synergies of over $6 million in April 2017 including from fuel, tire, and insurance synergies).

acquisition.[106]   Sellers argue that this is evidence of subjective bad faith because these events occurred when "W&S was nearing its needed EBITDA targets following Closing."[107]   As this Court has noted, some cases relating to "efforts clauses" can be disposed of at the pleading stage, whereas "some cases require[] factual inquiry and even trial."[108]   This case falls into the latter category, and this portion of the motion for summary judgment is denied.   Furthermore, this issue is sufficiently related to the claims concerning the Tractor Acquisition Covenant such that the Court would benefit from further development and presentation of the factual record.[109]

## C.   The Business Continuity Covenant

Schneider seeks a summary judgment that it did not "materially alter or change the type or nature of any Acquired Company's business from the business

---

[106] *See, e.g.*, Miller Aff. Ex. 57 at SNC_010035626 ("We made the decision at our last leadership meeting, because of the stress our network was under, to minimize the new accounts we were going after."), Ex. 62, Vinci Tr. 18:8-21:22 (testifying that he never had enough tractors to service customers), Ex. 66 ¶¶ 103-07 (citing deposition testimony indicating that Schneider consolidated its auto parts business into a single terminal, thereby increasing "transit times, costs, and the risk of damaging freight due to having to unload and reload cargo twice").

[107] Sellers Ans. Br. 48.

[108] *Himawan v. Cephalon, Inc.*, 2018 WL 6822708, at *7 (Del. Ch. Dec. 28, 2018).

[109] *Bouchard v. Braidy Indus., Inc.*, 2020 WL 2036601, at *16 (Del. Ch. Apr. 28, 2020) (denying motion for summary judgment where "further development of the factual record and the parties' legal arguments would help clarify the application of the law to the circumstances of the case.").

conducted by the Acquired Companies immediately prior to the Closing" in breach of the Business Continuity Covenant.[110] Schneider argues that "type or nature" should be construed broadly, while Sellers proffer a more narrow construction. In denying the cross-motions for judgment on the pleadings, the Court found both interpretations reasonable, noting that there was no evidence presented at that stage from which the Court could determine what was intended.[111]

The Business Continuity Covenant is part of the same paragraph as the Non-Transfer Covenant, which reads in full:

> In addition, except as the Buyer and Sellers' Representative may otherwise agree in writing, from the Closing Date through and including the last day of the final Measurement Period, the Buyer shall not, and shall not permit any of the Acquired Companies to reorganize, consolidate or otherwise take steps to sell, dispose or otherwise transfer any material portion of the assets of the Acquired Companies to an entity other than an Acquired Company or to materially alter or change the type or nature of any Acquired Company's business from the business conducted by the Acquired Companies immediately prior to the Closing.[112]

Schneider argues that its reading of "type or nature" is the only reasonable reading in light of the negotiating history of the operational covenants. Schneider points to evidence showing that Sellers proposed and Schneider rejected more

---

[110] SPA Ex. E.

[111] Dkt. 74 ¶¶ 10-12.

[112] SPA Ex. E. Schneider has not moved for summary judgment on Sellers' claim that Schneider breached the Non-Transfer Covenant by leasing tractors from W&S to other divisions within Schneider. Schneider Opening Br. 2.

specific operating covenants restricting Schneider's management of the Acquired Companies' post-transaction operations.[113] According to Schneider, the Business Continuity Covenant was intended only to prevent Schneider from moving the Acquired Companies' businesses away from trucking and the trucking segments in which the Acquired Companies operated.[114] In response, Sellers submit expert testimony that Schneider breached the Business Continuity Covenant by moving its auto parts delivery business to one of W&S's terminals, thereby interfering with W&S's operations, and by failing to acquire tractors sufficient to meet increased demand.[115]

The parties have not joined issue in a manner that enables the Court to confidently adjudicate this claim at the summary judgment stage. Neither side has pointed to testimony concerning what the parties intended by "type or nature" when it was included in the operational covenants. Schneider's rejection of more specific operational requirements supports its interpretation, but it has not persuasively established that Schneider's is the only reasonable interpretation.

---

[113] *Compare* Taylor Aff. Ex. 19, *with id.* Ex. 20.

[114] Schneider Opening Br. 44-49.

[115] Sellers' Ans. Br. 50-53.

In that regard, Schneider relies on *GRT, Inc. v. Marathon GTF Tech., Ltd.*, 2012 WL 2356489 (Del. Ch. June 21, 2012), but *GRT* is distinguishable.[116] There, the Court found that a contract which provided one party with facility access rights until a date certain unambiguously did not require the other party to keep the facility operational through that date. *Id.* at \*5-7. Even assuming the contract was ambiguous, the Court alternatively found the defendant was entitled to summary judgment because during contract negotiations, the plaintiff sought and did not obtain a specific bar on the defendant's ability to shut down the facility before the expiration of the access right deadline. *Id.* at \*7 ("Here, it is undisputed that GRT tried to get the right to require Marathon to operate the Demonstration Facility through December 31, 2012, but it failed to do so."). In contrast to *GRT*, the facts surrounding the negotiation of the Business Continuity Covenant are not so straightforward, at least not on the record presented.

Schneider acknowledges that if the terms "type or nature" of business are interpreted as Sellers contend, then there are issues of fact as to whether Schneider complied with the Business Continuity Covenant.[117] Based on the facts and arguments presented in the parties' briefs, the Court concludes that the issues are

---

[116] Schneider Opening Br. 44-49.

[117] Schneider Opening Br. 49 n.5.

sufficiently intertwined to warrant adjudicating all of the alleged breaches of the covenants in Exhibit E at once.[118]

## D.    The Implied Covenant of Good Faith and Fair Dealing

The Court previously held that it could not grant judgment on the pleadings on Sellers' claim for a breach of the implied covenant of good faith and fair dealing because "both parties assert reasonable interpretations of the express terms of the contract" and "the holes that the implied covenant may or may not fill cannot be determined at this stage."[119]  That statement holds with equal force at this stage.  The Court cannot determine that there are "no gaps" in the SPA and that Schneider acted in good faith, as Schneider urges, without first adjudicating the interpretation of the SPA.  Because summary judgment is not appropriate with respect to the parties' contested interpretations of the SPA, and the arc of the implied covenant claim is partly swept by the proper interpretation of the contract, this portion of the motion for summary judgment must be denied.

---

[118] *AeroGlobal Capital Mgmt., LLC v. Cirrus Indus., Inc.*, 871 A.2d 428, 444 (Del. 2005) (noting that it is an "exercise of 'good judicial administration [for a trial court] to withhold decision until [the record] present[s] a more solid basis of findings[.]'" (quoting *Kennedy v. Silas Mason Co.*, 334 U.S. 249, 257 (1948))); *In re El Paso Pipeline P'rs, L.P. Deriv. Litig.*, 2014 WL 2768782, at *9 ("When confronted with a Rule 56 motion, the court may, in its discretion, deny summary judgment if it decides upon a preliminary examination of the facts presented that it is desirable to inquire into and develop the facts more thoroughly at trial in order to clarify the law or its application.").

[119] Dkt. 74 ¶ 13.

Finally, because the Court denies Sellers' motion for summary judgment on its claim for breach of the Tractor Acquisition Covenant, the Sellers' related claim for an award of attorneys' fees and expenses is also denied.

## IV.  CONCLUSION

For the foregoing reasons, the parties' cross-motions for summary judgment are denied.

**IT IS SO ORDERED.**